1                         HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THAN ORN, | CASE NO. C13-5974 RBL |
| Plaintiff, | ORDER |
| v. | |
| CITY OF TACOMA, | |
| Defendant. | |

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Dkt. #90]. The Court has reviewed the materials filed in favor and opposed to the motion and has received the benefit of oral argument of counsel. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART.**

**I. PLAINTIFF'S VIEW OF THE FACTS**

Than Orn was a 34-year-old Cambodian-American husband and father of three living in an apartment complex on S. 65th St. and Tacoma Mall Boulevard. On October 12, 2011, at approximately 8:30 p.m., Orn was driving a white Mitsubishi Montero SUV down S. 64th St., with his parking lights on, but not his headlights. Orn passed a silver vehicle with no visible light bar, driven by Tacoma Police Department (TPD) Sgt. Alan Morris going in the opposite direction. Morris drove past the white SUV, turned his vehicle around, turned on his emergency lights mounted at the

top of his windshield and accelerated to catch up to Orn. At 8:31 p.m., Sgt. Morris radioed to dispatch that he was attempting to pull the vehicle over but the vehicle was not stopping. Orn drove between 25 and 35 MPH. Morris characterized Orn's actions as failing to yield, but did not consider his driving reckless. Morris followed the vehicle and continued to give updates to dispatch.

Officer Daniel Bortle joined Sgt. Morris in the pursuit of Orn. According to Bortle, he maneuvered his patrol car alongside Orn with Sgt. Morris "to try and box [Orn] in." Bortle pulled up to Orn with Morris behind him, traveling 30–35 MPH, and according to Bortle, Orn swerved his car at him. Officer Bortle, Sgt. Morris and Officer Michael Johnson initiated a "rolling roadblock" maneuver in an attempt to stop Orn's vehicle.

Officer Bortle, Sgt. Morris and Officer Johnson pulled alongside Orn, traveling between 5 and 15 MPH. According to Officer Bortle, TPD's policy at the time regarding the use of a rolling roadblock was that it was only allowable in situations involving the use of deadly force, where the situation involved an imminent threat to bodily injury or death. But Bortle admits there were no reports of Orn being suspected of a violent felony or that he had a firearm. Further, there were no reports of Orn's actions escalating which justified the use of deadly force.

Officers Donald Rose and Kristopher Clark were inside TPD's three sector substation at Wapato Park when they heard Sgt. Morris first call out that he was trying to stop Orn's vehicle. Morris had radioed dispatch that the vehicle was failing to yield.

Officers Rose and Clark went out to Clark's Ford Expedition patrol vehicle and headed to the direction that Sgt. Morris was calling out over the radio. Rose and Clark were about 15 blocks away from Morris. Rose and Clark knew that only a traffic violation had occurred and the Orn vehicle was failing to yield. The officers also knew that neither violation was a felony and that the Orn vehicle was not implicated in any felony situation. In the continuum of force, as the officers understood Than Orn's behavior, Orn was only considered to be "active resistant." Rose and Clark were

"paralleling the pursuit," meaning they were not in line with other officers following Orn but were following on side streets. Five to seven TPD vehicles were following behind Orn at this time.

Clark and Rose blocked westbound traffic at the intersections of 56th and Alaska, by positioning the Expedition in the roadway with their lights on, in order to keep general traffic away. Neither Clark nor Rose left the vehicle. A nearby officer was laying out spike strips in the road to try and puncture the Orn vehicle's tires. According to Officer Rose, Than Orn, still only traveling about 30 mph, swerved his vehicle away from the officer deploying the spike strips rather than drive at him. At the time Orn's vehicle swerved around the spike strips, there was no oncoming traffic and no danger in his pathway. In addition, Orn's speed continued to be a "pretty low speed" between 30–35 mph.

After paralleling Orn's vehicle, Clark and Rose heard over the radio that Orn's vehicle was registered to an apartment at the Valley Vista apartment complex just off Tacoma Mall Boulevard. At the time, the patrol cars following Orn were at the south entrance of the apartments. Clark and Rose pulled into the north entrance to get in front of the pursuit.

Once he was inside the parking lot of Orn's apartment complex, Officer Clark positioned his vehicle in the thoroughfare of the main parking lot near the north entrance so that the front of his vehicle was near an island that butted out into the parking lot area. Officer Clark has submitted an affidavit admitting that he parked his Ford Expedition, a full-size SUV, "across a narrow point in the thoroughfare near the north entrance" of the apartment complex's parking lot, which he believed "would prevent Mr. Orn from exiting the parking lot." Clark's declaration also further asserts that his intent was "containment" rather than to create a roadblock.

Other officers concur that Clark's vehicle was a roadblock. Clark's partner, Officer Rose, described Clark's vehicle positioning as "effectively cut[ting] off northbound travel through the parking lot right there." Officer Daniel Bortle described Clark's SUV as facing in an east-westerly

position, and, blocking the roadway. Officer Clark ignored the command to stay in his vehicle, and instead, used his car as a roadblock.

As Than Orn's vehicle entered the Valley Vista apartment complex, Officer Bortle, who was traveling in the caravan behind Orn with Officer Kim, K-9 Officer David Johnson, and Sgt. Morris, estimates that Orn traveled approximately 15 mph. Bortle also testified that as Orn's vehicle approached Clark's Expedition, "For just a brief second the vehicle did pause."

Officer Kim, travelling immediately behind Orn, testified in Than Orn's criminal trial and in his deposition that Orn was traveling very slowly in the apartment complex.

As Orn approached Officer Clark's Ford Expedition, Than Orn drove away from where Officer Clark had positioned himself, and instead drove onto a grass planting strip around Clark's vehicle and opposite of where Clark was standing. Officer Steven Butts, who also came in at the north entrance of the apartment complex, arrived in his patrol car and parked his vehicle just north of where Clark's Expedition was blocking the road. Officer Butts stayed in his patrol vehicle behind Clark's vehicle but could see Orn's caravan coming forward. He watched as Than Orn's vehicle was coming closer to Clark's blocking vehicle. Orn was traveling "maybe five miles an hour when it slowed." Then Orn either stopped or slowed down substantially before Officer Clark's vehicle. Butts watched the Orn vehicle drive away from where Clark had positioned himself, and then up on the grass planting strip. Officer Butts testified that Orn's vehicle was going very slowly, 3-4 mph, as it went onto the grass and back down again. As Orn was driving on the grass planting strip, Butts intentionally backed his car up seeking to cut off any route for Than Orn to escape. After doing so, Orn's vehicle, still traveling 4 mph according to Butts, came into contact with the front push bar of Butts's car. Butts heard plastic crunching and felt a jarring of the vehicle, but the impact was so minor that it didn't actually move Butt's vehicle.

As he was coming through the narrow entrance, Orn also made contact with the rear bumper of Clark's Expedition. Officer Rose, who was still in the vehicle, called the contact from Orn a glancing blow.

Officer Clark states that he moved from the grass median where he was standing (opposite of the grass patch Orn drove on), to a position either at or behind his vehicle's bumper. Clark further states that he was positioned "out of [Orn's] direct path of travel. However, neither of the officers immediately in the area, Rose or Butts, saw Clark."

Officer Clark claims he then saw Orn's vehicle turn towards him and the vehicle accelerated at him. Clark also states that at that same moment, he "could hear the engine of [Orn's] vehicle under hard acceleration." Clark doesn't explain how but, despite his position behind the bumper, he claimed the vehicle was now coming at him. Clark then claims that he extended his left arm to brace for the impact of Orn's vehicle and began to move backwards. He claims he believed that Orn was trying to run him over, and because of his close proximity to Orn's vehicle, he had to raise his pistol and fire downward while his left hand remained on Orn's vehicle.

Officer Butts, who approximates that he was no more than eight feet from Clark's vehicle, did not see Clark. Butts watched Orn's vehicle traveling right in front of him, going 3-4 mph as it was coming off the grass, but Butts also did not see Clark reach out his hand and touch the car. He just heard shots being fired and glass shattering on Orn's vehicle. Officer Butts also testified to a much different time sequence of the alleged hard acceleration by Than Orn's vehicle. Rather than a "hard acceleration" before shots were fired as claimed by Officer Clark, Butts heard the hard acceleration only after Clark fired his gun.

Officer Clark has described his second volley of shots at the Orn vehicle as being fired because he was in fear for the safety of his partner, Donald Rose. "I believed that Mr. Orn had just assaulted me with a deadly weapon and that he would intentionally try and run other officers over, and therefore, I believed that Mr. Orn was an imminent threat to my partner. Therefore, I fired five or

six more times, in rapid succession, at Mr. Orn through the back window of his SUV." Officer Rose, however, was inside the Ford Expedition and never exited the patrol vehicle until after Than Orn was shot. More importantly, Rose does not recall his partner, Officer Clark, ever telling him about his concerns for Rose's safety. Instead, the only safety concern Clark told Rose about was his own, even as the Orn vehicle was moving away.

Chief Donald Ramsdell, in his administrative review of the Use of Deadly Force Review Board's finding, confirmed two things: 1) That Officer Clark's official statement to investigators about his safety were different than what he told his partner, Officer Rose; and 2) No one, not Clark, Rose or anyone else, was in the path of danger while Officer Clark was "running and shooting," as Officer DeNully described it, as Than Orn's vehicle was moving away.

In addition to the multiple, significant differences between what Officer Kristopher Clark told investigators versus what others observed and the admissions Clark made to his partner, Donald Rose, the evidence does not support Clark's claims about the shooting of Than Orn. First, Detective Gene Miller, the detective tasked with investigating the shooting scene, testified that Kristopher Clark's alleged palm print on the side of the Orn vehicle, could not be conclusively matched to Officer Clark.

Second, the evidence supports the argument that Than Orn's vehicle was not a threat to Kristopher Clark at any point when he fired because Orn's vehicle was already passing by.

Third, the defendants' ballistic expert testified that the angle of the first volley of shots shows that the paralyzing shot to Than Orn's back from the passenger-rear window was fired between 2 feet and 4 feet away from the side of the car, contradicting Officer Clark's claims that he was touching Orn's vehicle as it was passing him.

On May 10, 2012, TPD's Use of Deadly Force Review Board met to consider whether Kristopher Clark's use of deadly force against Than Orn was reasonable and within Department policy. The final decision was ratified and approved by Chief Ramsdell. Although the Board found

Clark's actions to be within Department Policy, the Board included retraining requirements for Officer Clark which included recommendations to re-train in the areas of "Positioning Self Once Exiting His Patrol Vehicle" and "Environmental Awareness and Location within Potential Deadly Circumstance (Vehicle Position Angle-Positional reactions.)"

In the wake of the shooting, the Pierce County Prosecutor's office, working together with TPD Detective Miller, brought criminal charges against Than Orn seeking to convict Orn of Assault 2 for the alleged touching of Officer Clark with his vehicle and Felony Alluding. After five days of testimony, the jury came back with "Not Guilty" verdicts for both the assault charge and felony alluding. Orn was acquitted of the assault charge against Officer Clark but convicted of the misdemeanor of "Failing to Obey a Law Enforcement Officer." He was fined $250.00. Than Orn remains paralyzed from the waist down.

## II. ISSUES PRESENTED BY THE MOTION

**A. Whether plaintiff's claim for excessive force against Officer Clark should be dismissed where the officer's use of deadly force was objectively reasonable under the totality of circumstances confronting the officer.**

**B. Whether plaintiff's claim for excessive force against Officer Clark should be dismissed as the officer is immune from suit pursuant to the doctrine of qualified immunity.**

**C. Whether plaintiff's municipal liability claim for a failure to train should be dismissed where plaintiff cannot establish the essential elements of his prima facie case.**

**D. Whether the children's' loss of consortium claims based on alleged deprivations of Than Orn's constitutional rights should be dismissed as such rights are personal and will not support a claim for another's loss of consortium.**

**E. Whether the children's' loss of consortium claims based on a state tort claims for assault and battery should be dismissed as the claims are time barred.**

**F. Whether plaintiff's negligent hiring, training and supervision claims against the City of Tacoma should be dismissed where the City's employees were acting within the course and scope of employment and where plaintiffs cannot establish all essential**

**elements for these claims.**

**G. Whether plaintiff's negligence claims against the defendants should be dismissed where Officer Clark's use of deadly force was an intentional act and where plaintiff cannot establish that the violation of any policies was the proximate cause of his damages.**

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

# IV. ANALYSIS

**A. Excessive Force**

Legitimate issues of fact are best determined by a jury. Excessive force is examined under the Fourth Amendment's prohibition of unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Whether the officers' use deadly force was reasonable in these circumstances is a question fraught with factual issues. Under *Graham*, three specific factors must be considered in assessing the reasonableness of the force used: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Smith v. City of Hemet*, 394 F.3d at 701 (citing *Graham*, 490 U.S. at 396). Whether the suspect poses a threat to the safety of officers or others is "the most important single element of the three specified factors." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The other *Graham* factors – the severity of the crime at issue, and the suspect's attempts to actively resist arrest or evade by flight – also present factual questions. A jury could find that it was unreasonable for an officer to conclude that deadly force was warranted in this situation. Defendants' motion for summary judgment on the excessive force claim is **DENIED**.

**B. Qualified Immunity**

Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198(2004). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232(2009). Qualified immunity protects officers not just from

liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible state in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2(1987). The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause [to arrest] is present," qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced,* 639 F.3d 1206, 1208 (9th Cir. 2011) *(*quoting *Anderson*, 483 U.S. at 641).

Importantly a court must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Courts are cautioned to make "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. And, although the question is "highly fact-specific," the inquiry is objective: a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *Id*. (citing *Scott v. Harris*, 550 U.S 372, 383(2007); *Graham*, 490 U.S. at 397).

The testimony of the officers involved in the pursuit of Orn does not present a comprehensive, consistent story of what happened and why. Thus, it cannot be said as a matter of law that the officers are entitled to qualified immunity. Defendants' motion for summary judgment on qualified immunity is **DENIED**.

**C. *Monell* Claim**

The United States Supreme Court has held that municipalities may be held liable as "persons" under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 694 (1978). A plaintiff may establish municipal liability by demonstrating that an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* (internal citation and quotations omitted). To establish a ratification claim, Plaintiffs must present evidence of "a 'conscious, affirmative choice' on the part of the authorized policymaker." *Id.* (quoting *Gillette*, 979 F.2d at 1347). "A local government can be held liable under § 1983 only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (internal quotations omitted). The policymaker must have knowledge of the alleged constitutional violation. *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

Plaintiffs argue Tacoma is liable under *Monell* based on a "ratification theory." The Court is persuaded by the holding in *Rosales v. City of Chico*, No. CV21402152WBSCMK, 2015 WL6167740, at *7–8 (E.D. Cal. Oct. 20, 2015), where the court denied the defendant city's motion for summary judgment on plaintiffs' *Monell* claim when the chief of police pronounced that the allegedly offending officer's conduct was "in compliance with Department policy." The court explained:

In this case, it is not a mere ratification, but rather the Chief of Police's pronouncement that Officer Bailey's alleged use of force was "in compliance with Department policy" that gives rise to a *Monell* claim. This is "tantamount to the announcement or confirmation of a policy for purposes of *Monell*." The Chief of Police's finding that Officer Bailey's use of force was "in compliance" with the City of Chico's policies is more than sufficient to raise a genuine issue of material fact with respect to whether the City of Chico had a policy of using the force Officer Bailey did in this case. Although the finding was made after the incident, it constitutes clear evidence from which a rational jury could infer that the policy existed before the incident and therefore was the moving force that caused the injury. If the jury ultimately concludes that Officer Bailey used excessive force and that the use of force comported with the City of Chico's policies, it would be entirely consistent with *Monell* to hold the City of Chico liable based on its policy promoting that use force.

Accordingly, because plaintiff has raised a genuine issue of material fact with respect to whether the City of Chico had a policy that caused the constitutional violation alleged in this case, the court must deny defendants' motion for summary judgment on plaintiff's § 1983 *Monell* claim.

Municipalities are required to review police shootings and carefully determine whether the shooting complied with local policy, and then determine whether or not discipline is appropriate. A rational jury could find that Clark's decision to shoot was not constitutionally justified, and that Tacoma ratified that unconstitutional decision by determining it was lawful and within policy. Summary judgment on the *Monell* claim against Tacoma is accordingly **DENIED**.[1]

### D. Children's Constitutional Claims

Ninth Circuit precedent holds that "a parent who claims loss of the companionship and society of his or her child, or vice versa . . . has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child . . . ." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (citing *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986); *Kelson v. City of Springfield*, 767 F.2d 651, 653–55 (9th Cir.

---

[1] This is a reversal of the Court's stated position at oral argument. After oral argument, the Court reviewed *Rosales* and the record and determines there is sufficient evidence of ratification to survive summary judgment, notwithstanding the Court's initial inclination.

1985)); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998) (noting that plaintiffs "may assert a Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with [their deceased son]"). This is true even where the deprivation is incidental to the state's acts. *Ostling v. City of Bainbridge Island*, 872 F.Supp.2d 1117, 1127 (W.D. Wash. 2012).

Official conduct that "shocks the conscience" in depriving children or parents of that interest is cognizable as a violation of due process. *Wilkinson v. Torres*, 610 F.3d 546, 555 (9th Cir. 2010) (citations omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*. (internal citation omitted).

Plaintiffs assert that Officer Kristopher Clark's unconstitutional use of force against Than Orn was a violation under the Fourth Amendment and the Fourteenth Amendment. Plaintiffs further contend that as a direct and proximate result of these constitutional violations, the Orn children have lost the care, affection, companionship, society, support and consortium of their father as a result of their father's substantial injuries.

Plaintiffs have presented facts that could establish that Defendant Kristopher Clark had the time, and took the time, to deliberate and decide to use deadly force against Than Orn, leaving him critically injured and ultimately paralyzed. This was not a "snap decision" as cautioned against in *Wilkinson*. *Wilkinson*, 610 F.3d at 555. Officer Clark ignored orders to stay in his vehicle. He deliberately created a roadblock in a situation that did not warrant the use of deadly force. And then, as the evidence shows, he fired at Than Orn as Orn's vehicle was passing Clark when there was no danger of imminent harm to Clark or to anyone else. Further, Clark continued to fire at Orn's vehicle

seven to eight more times as it was traveling away from Clark. Plaintiffs articulate a colorable claim that in using such excessive force, Kristopher Clark materially diminished Than Orn's relationship with his children. As such, Thalisa Orn, J.O., and C.O., should be allowed to maintain a claim for violation of their substantive due process interest in the companionship of their father, Than Orn. *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d at 1127. The motion for summary judgment on this claim is **DENIED**.

**E. Children's Claim – Statute of Limitations**

Defendants allege that the children's claim is time barred. They rely in large part on *Kelley v. Centennial Contractors Enter. Inc.*, 236 P.3d 197 (Wash. 2010). In *Kelley*, the children of a man critically injured by a falling steel beam brought a separate action, after their father's lawsuit had already resolved. "Six months after the judgment was rendered in Phillip Blackshear's lawsuit against Centennial, the three Blackshear minor children commenced their lawsuit against Centennial for loss of parental consortium." *Id.* at 198. Washington's Supreme Court considered whether the children's separate action was allowable because the statute of limitations for minors, codified under RCW 4.16.190, tolls until the age of 18. *Id.* at 200. The Court opined that a question of fact existed as to whether the children were able to feasibly join their father's lawsuit at the time it was being litigated, or whether, based upon the continuing nature of the father's injury past the resolution of his own case, joinder was not practicable. *Id.* at 201.

The Orn children joined their father's lawsuit; they are not seeking to file their own. As Defendants concede, Mr. Orn filed his original complaint for damages on October 10, 2013, prior to the running of the two-year statute of limitations for assault and battery claims in Washington State. Wash. Rev. Code § 4.16.100. Necessarily, Mr. Orn's added claims for assault and battery relate back to the initial filing date. Under RCW § 4.16.190, the Orn children's claims must toll until the age of 18, and under *Kelley*, the children's claims must be joined, if feasible, with their father's lawsuit. The

Orn children have done precisely that: they have joined their father's suit. The motion for summary judgment on this issue is **DENIED**.

**F. Negligent Hiring – State Law**

Claims of negligent hiring, retention, training, and supervision are based not on the concept of vicarious liability (*respondeat superior*), but on the notion that "the employer's *own* negligence is a wrong to the injured party, independent from the employer's liability for its employee's negligence imputed by the doctrine of respondeat superior." *Evans v. Tacoma School Dist.*, 380 P.3d 553, 564 (Wash. Ct. App. 2016) (citing *Niece*, 929 P.2d at 420).

In cases such as the instant case, where the plaintiff is asserting that the allegedly tortious employee was acting within the scope of his or her employment, claims for negligent supervision are redundant and futile. As the Washington Court of Appeals observed in *Gilliam v. Dep't of Soc. and Health Serv.*:

> *Here, the State acknowledged Morrow was acting within the scope of her employment, and that the State would be vicariously liable for her conduct. Under these circumstances a cause of action for negligent supervision is redundant.* If Gilliam proves Morrow's liability, the State will also be liable. If Gilliam fails to prove Morrow's liability, the State cannot be liable even if its supervision was negligent.

950 P.2d 20, 28 (Wash. Ct. App. 1998) (emphasis added). Thus, "an injured party generally cannot assert claims for negligent hiring, retention, supervision or training of an employee when the employer is vicariously liable for the employee's conduct." *Evans*, 380 P.3d at 564 (citing *LaPlant v. Snohomish Cty.*, 217 P.3d 254 (Wash. Ct. App. 2011)).

The *Gilliam* and *Evans* courts' analysis is equally applicable to the instant case. In this case, all of the officers involved in this incident were acting within the course and scope of their employment and Plaintiffs concede as much. Because there is no dispute that the City's employees were acting within the course and scope of their employment, Plaintiffs' negligent

hiring, training, and supervision fail claims fail as a matter of law. Accordingly, summary judgment on this claim is **GRANTED** and the claim is **DISMISSED WITH PREJUDICE**.

**G. Negligence Claim**

Plaintiffs' negligence claim seeks to hold the City responsible for the actions of its agents, which Defendants acknowledge were acting within the course and scope of their employment. As such, if the jury finds Officer Kristopher Clark liable for the battery of Than Orn, the City of Tacoma is ultimately responsible for the actions of its agents and employees.

Washington recognizes the state tort of battery by a law enforcement officer in an excessive force case. *Staats v. Brown*, 991 P.2d 615 (Wash. 2000). In *Staats*, Washington's Supreme Court found that the arresting officer was protected by qualified immunity with regard to the § 1983 false arrest claims because Fourth Amendment law was not clearly established at the time of that particular arrest. *Id*. at 77. However, qualified immunity under § 1983 did not immunize the arresting officer from claims under state law of the torts of assault and battery. *Id*. at 780. The court found that state qualified immunity is not available for claims of excessive force to effectuate an arrest. *Id.* (citing *Coldeen v. Reid*, 182 P. 599 (1919)). Excessive force in which a police officer was "acting oppressively or wantonly injuring a person escaping from a misdemeanor arrest," does not allow for qualified immunity. *Id*. As a policy, it is preferable to allow a civil action against the officer, rather than the alternative of physical resistance by the arrestee. *Id*.

The *Staats* court further noted that state immunity is different from qualified immunity under federal law. *Id.* at 779. Qualified immunity under state law is assessed when the officer (1) carries out a statutory duty (2) according to procedures dictated to him by statute or superiors, (3) acts reasonably. *Id*. citing *Guffy v. State*, 690 P.2d 1163 (Wash. 1984). State qualified immunity does not deal with the issue of whether or not a given right is "clearly established" at the time of

the incident. *Id*. Additionally, as suggested in *Staats*, the personal immunity of qualified immunity would not extend to the employer, in this case, the City of Tacoma. *Id.*; *see also, Savage v. State*, 899 P.2d 1270 (Wash. 1995), (holding that under state law, personal qualified immunity of the agent or employee does not extend to the principal or the employer). The motion for summary judgment on the negligence claim is **DENIED**.

## V. CONCLUSION

The motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

**A. Excessive Force – DENIED.**

**B. Qualified immunity – DENIED.**

**C. *Monell* Liability – DENIED.**

**D. Children's Constitutional Claims – DENIED.**

**E. Children's Claims – Statute of Limitations – DENIED.**

**F. Claims for Negligent Hiring, Training and Supervision – GRANTED.**

**G. Negligence Claim – DENIED.**

IT IS SO ORDERED.

Dated this 9th day of April, 2018.

Ronald B. Leighton
United States District Judge